United States District Court
Southern District of Texas

**ENTERED**

November 26, 2019

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PETE SOLIZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-2775 |
| | § | |
| ANDREW SAUL,[1] | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 12) and Defendant's Cross-Motion for Summary Judgment (Doc. 13). The court has considered the motions, Defendant's response, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) and for judicial review of a partially favorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance

---

[1]   Nancy Berryhill was the Acting Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Andrew Saul is now Commissioner of the SSA and, as such, is automatically substituted as the defendant in this case. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2]   This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 8, Ord. Dated Dec. 4, 2018.

benefits under Title II of the Social Security Act ("the Act").

## A.   **Vocational and Medical History**

Plaintiff was born on February 6, 1963, and was fifty years old on the alleged disability onset date of December 23, 2013.[3] Plaintiff, who earned a high school diploma,[4] worked at the Corpus Christi Army Depot from May 1988 to December 2013, first as a helicopter mechanic and then in quality assurance in charge of helicopter parts.[5]

In a letter dated January 25, 2016, the U.S. Department of Veterans Affairs ("VA") informed Plaintiff that the VA had rated his service-connected disabilities at seventy percent.[6]   A VA benefits letter dated May 23, 2018, indicated that Plaintiff's seventy-percent rating was effective as of May 10, 2010, based on major depressive disorder with anxious distress.[7]   The 2018 benefits letter stated that the VA "granted entitlement to the 100% rate effective December 24, 2013, because [Plaintiff was] unable to

---

[3]   See Doc. 7, Tr. of the Admin. Proceedings ("Tr.") 78, 92, 93, 111, 201, 236.

[4]   Plaintiff's administrative paperwork stated that he earned a General Equivalency Diploma (GED), but Plaintiff stated at the hearing that he earned a high school diploma in the U.S. Army.   Compare Tr. 50 with Tr. 241.   Plaintiff also stated in the hearing that he held an airframe and powerplant aviation license.   See Tr. 50.

[5]   See Tr. 51-52, 200, 241-42, 278-79.

[6]   See Tr. 1040.

[7]   See Tr. 6-7.

work due to [his] service-connected disabilities."[8]

Although Plaintiff received treatment for a variety of ailments since the alleged onset date, his eye condition is the only medical issue challenged in Plaintiff's appeal of the ALJ's opinion.  Therefore, the court reviewed the evidence relevant to Plaintiff's vision during the period from the alleged onset date to the date on which the ALJ found Plaintiff qualified as disabled.[9]

On March 14, 2014, Plaintiff attended an appointment at Bay Area Vision for an eye examination.[10]  His visual acuity was 20/70 in his left eye and, with contact lenses, 20/50 in his right eye.[11]  The examiner entered a diagnosis of corneal keratoconus[12] in both eyes and prescribed contact lenses.[13]  On April 2, 2014, Plaintiff returned, complaining of blurred vision and seeking proper fitting of the lenses.[14]

On May 27, 2014, Plaintiff again returned to Bay Area Vision and reported that the lens comfort level was good but that he

---

[8]     Tr. 7.

[9]     In addition to the challenges raised by Plaintiff, the court reviewed the ALJ's entire decision for legal errors and/or a lack of substantial evidence.

[10]    See Tr. 379.

[11]    See id.

[12]    "Keratoconus is a progressive thinning of the cornea" and "can cause moderate to severe blurred vision, multiple images, glare, and halos around objects at night."  What is keratoconus?, WebMD (January 2018), https://www.webmd.com/eye-health/qa/what-is-keratoconus.

[13]    See Tr. 380.

[14]    See Tr. 378.

3

experienced blurred vision while driving and was unable to see road signage at night.[15]   After performing an eye examination, the treatment provider diagnosed Plaintiff with corneal keratoconus with internal astigmatism in both eyes and prescribed glasses.[16]

On April 8, 2015, Plaintiff attended another appointment at Bay Area Vision and complained of "blur at distance and near in both eyes for all the time" with a severity rating of moderate.[17] The treatment provider performed an eye examination, listed as diagnoses corneal keratoconus and corneal scarring in both eyes and recommended consultation with another physician.[18]

On May 19, 2015, Plaintiff saw Thomas Dietze, M.D., ("Dr. Dietze") for a corneal transplant evaluation.[19]   At that time, Plaintiff reported that he could not see well enough to drive at night and needed to wear prescription sunglasses to reduce the glare when driving during the day.[20]   Dr. Dietze determined that Plaintiff was a good candidate for a corneal transplant in his left eye and performed the surgery on June 3, 2015.[21]   The day after

---

[15]   See Tr. 376.

[16]   See id.

[17]   Tr. 372.

[18]   See Tr. 372-75.

[19]   See Tr. 531.

[20]   See id.

[21]   See Tr. 532, 545.

4

surgery, Plaintiff reported "doing well" with no pain.[22]

A week out from the surgery, Plaintiff complained of discomfort in his left eye and surrounding facial area and difficulty opening his left eye.[23]  However, he reported improving vision.[24]  Three weeks later, Plaintiff reported that he continued to experience problems opening the left eye but that his visual acuity continued to improve.[25]  Plaintiff's uncorrected vision was 20/50 in his left eye.[26]

From July 28, 2015, to July 20, 2016, Dr. Dietze saw Plaintiff eight times.[27]  At certain appointments, Plaintiff reported experiencing very good vision overall and/or improved night vision; at others, he reported experiencing dryness and/or poorer visual acuity.[28]  On at least two occasions, Plaintiff described his visual acuity as coming and going.[29]  On July 20, 2016, Plaintiff described his vision in these words: "sometimes its perfect but most of the time it[']s cloudy."[30]

---

[22]    See Tr. 543.

[23]    See Tr. 546.

[24]    See id.

[25]    See Tr. 548.

[26]    See id.

[27]    See Tr. 550-69.

[28]    See id.

[29]    See Tr. 656, 568.

[30]    Tr. 568.

5

On September 27, 2016, Plaintiff stated that he was "doing well, no pain or discomfort" but that his vision was "still a little blurry."[31]  On February 1, 2017, Plaintiff reported that his vision was "ok but everything look[ed] dim or dark."[32]  Plaintiff's corrected vision was 20/40 in each eye.[33]  Dr. Dietze diagnosed Plaintiff with trace nuclear sclerosis[34] in his left eye and with keratoconus and scarring of the cornea in his right eye.[35]  The doctor recommended wearing sunglasses and scheduling an appointment in six months.[36]  On August 1, 2017, Plaintiff's corrected vision was 20/30 in each eye.[37]  Plaintiff reported no changes in visual acuity and denied pain or discomfort.[38]

On January 30, 2018, Dr. Dietze saw Plaintiff again.[39]  The treatment note stated, "Pt [patient] states doing well, VA [visual acuity] is fine."[40]  Plaintiff's corrected vision was 20/50 in his

---

[31]     Tr. 612.

[32]     Tr. 1044.

[33]     See id.

[34]     When the clouding of the eye is severe enough, it is called a nuclear cataract.   What is Nuclear Sclerosis?, Healthline (January 4, 2018), healthline.com/health/nuclear-sclerosis.

[35]     See Tr. 1045.

[36]     See id.

[37]     See Tr. 732.

[38]     See id.

[39]     See Tr. 1042.

[40]     Id.

left eye and 20/30 in his right eye.[41]  Dr. Dietze recorded that Plaintiff exhibited trace signs of cataracts in the left eye and keratoconus and scarring of the cornea in the right eye.[42]  The doctor instructed Plaintiff to schedule an appointment in six months.[43]

## B.  __Application to SSA__

On May 10, 2016, Plaintiff applied for disability insurance benefits claiming an inability to work since December 23, 2013, due to herniated discs in his back, torn left rotator cuff, hearing loss, high cholesterol, keratoconus, shin splints, anxiety, and depression.[44]

In a function report dated July 7, 2016, Plaintiff stated that a normal day included, among other activities, placing drops in his eyes, watching television, and caring for his dog.[45]  He reported that he was no longer able to drive at night and was limited in his ability during the day.[46]  Plaintiff also said that he would leave the house twice a week, and, although he could drive, his wife would always go with him because, in addition to experiencing

---

[41]  See id.

[42]  See Tr. 1043.

[43]  See id.

[44]  See Tr. 78-79, 92-94, 111, 201, 236, 240, 269.

[45]  See Tr. 49, 270-71.

[46]  See Tr. 269, 272.

7

anxiety, "sometimes" his vision would "come[] and go[]."[47] Plaintiff reported being able to shop for groceries in store and buy gifts online.[48]   According to Plaintiff, he was capable of handling finances but "[u]sually" did not due to poor eyesight.[49] Plaintiff indicated that he was able to read written instructions and that he wore contacts all of the time and glasses for reading.[50]

On September 9, 2016, Sonia Holmes, M.D., ("Dr. Holmes") performed an internal medicine consultative examination and addressed Plaintiff's physical conditions.[51]   Concerning Plaintiff's vision, Dr. Holmes documented Plaintiff's subjective complaints of "chronic blurred and cloudy vision, photophobia, poor night vision, dry eyes, and discomfort[,]" as well as Plaintiff's account of the treatment history.[52]   Dr. Holmes listed keratoconus status post left-eye corneal transplant as one of Plaintiff's diagnoses but did not include any visual limitations in her assessment of Plaintiff's functional capacity.[53]

On September 16, 2016, the SSA found Plaintiff not disabled at

---

[47]    Tr. 272.

[48]    See id.

[49]    See Tr. 272-73.

[50]    See Tr. 274-75.

[51]    See Tr. 602-09.

[52]    Tr. 603.

[53]    See Tr. 605.

the initial level of review.[54]  The reviewing medical consultant
mentioned Plaintiff's treatment for his eye condition but listed
only one severe impairment:  dysfunction of major joints.[55]  No
visual limitations were identified in the residual functional
capacity ("RFC") assessment.[56]

A subsequent function report, dated December 14, 2016,
mentioned the left-eye lens replacement, but, Plaintiff stated, he
experienced difficulty seeing at night and in the sun.[57]  Plaintiff
said that he no longer was able to drive because of his poor
eyesight and anxiety.[58]  Plaintiff remained able to shop online,
according to the report, but found it difficult to see paper money
or written instructions.[59]

Upon Plaintiff's request for reconsideration, the SSA again
found Plaintiff not disabled on January 9, 2017.[60]  The reviewing
medical consultant agreed with the initial reviewer that, despite
his eye condition, Plaintiff did not have any visual limitations.[61]

---

[54]     See Tr. 78-92, 114-18.

[55]     See Tr. 83.

[56]     See Tr. 87.

[57]     See Tr. 285.

[58]     See Tr. 288.

[59]     See Tr. 288-90.

[60]     See Tr. 93-111, 119-24.

[61]     See Tr. 103.

On February 10, 2017, Plaintiff requested a hearing before an ALJ.[62]
On October 27, 2017, the SSA granted Plaintiff's request for
critical case (expedited) processing.[63]  On December 12, 2017, the
ALJ notified Plaintiff that a hearing was scheduled for March 20,
2018.[64]

### C.  **Hearing**

At the hearing, Plaintiff and a vocational expert testified.[65]
Plaintiff was represented by an attorney.[66]  The ALJ began the
examination of Plaintiff by confirming personal information and
work history.[67]  Amid other information, Plaintiff confirmed that
he held a valid driver's license with no restriction other than
corrective lenses and that he typically drove twice a week.[68]  The
ALJ inquired about Plaintiff's VA disability rating, which
Plaintiff stated was seventy percent: "I think [for] my lower back,
my left shoulder, hearing loss and shin splints to my
recollection."[69]

Plaintiff's attorney took over the questioning and began with

---

[62]   See Tr. 125.

[63]   See Tr. 147.

[64]   See Tr. 158-63.

[65]   See Tr. 43-77.

[66]   See Tr. 43, 46.

[67]   See Tr. 48-52.

[68]   See Tr. 49.

[69]   Tr. 51.

questions about Plaintiff's eyes.  Plaintiff answered:

> My left eye is a new eye.  I had keratoconus on [sic] it.
> It got so bad, contoured -- contact on there, it got
> maxed out where they could no longer make me new
> contacts[,] so basically I was blind on [sic] my left
> eye.  So the only thing I could do is have a surgery on
> it.  So they gave me a new eye.  I've had it for about
> two years or so.  I still can't see as well as I thought
> I was going to be able to see.  However, I can see.  I
> cannot see at night.  The sunlight bothers my eye.  And
> then when it's dark I can't see again.
>
>         . . . .
>
>     And I also wear glasses to help me see a little
> better.
>
>         . . . .
>
>     My right eye has keratoconus[.] I have a contact on
> there.  The contour that's on there right now is maxed
> out already.  Once I have more trouble seeing out of this
> eye[,] I will need surgery.  I do wear a contact in my
> [right] eye and glasses just to see a little bit okay.
> I do have blurred vision on [sic] both eyes.[70]

Upon further questioning about his eyes, Plaintiff reported that he

could not see very small print and that the glare from a computer

blinded him and caused headaches.[71]

Following the attorney's questioning of Plaintiff about all of

his other ailments, the ALJ elicited the vocational expert's

opinion.[72]  The vocational expert classified Plaintiff's prior work

as a mechanic as medium and skilled and his prior work in quality

---

[70]    Tr. 52-53.

[71]    See Tr. 54.

[72]    See Tr. 66-74.

11

assurance as light and skilled.[73]   The ALJ asked the vocational expert to consider "a hypothetical individual of the same age, education and work experience as [Plaintiff]."[74]   The ALJ provided further description:

> The hypothetical individual retains the capacity to perform a full range of light work except this individual is limited to occasional balancing, stooping, kneeling, crouching, crawling, climbing of ramps and stairs. [He] cannot climb ladders, ropes or scaffolds.
> The hypothetical person is also limited to no left [-]side overhead reaching, and frequent left[-]side reaching in all other directions. [He] must avoid concentrated exposure to noise. [He is] limited to frequent left-side handling.
> This individual can understand, carry out and remember detailed but not complex instructions; can make decisions, attend and concentrate for two hours at a time; can interact occasionally with the public, supervisors and coworkers; and respond appropriately to occasional changes in [a] routine work setting.[75]

The vocational expert opined that such an individual could not perform Plaintiff's previous work but could perform the work of a silver wrapper[76] with 505,000 positions nationally and an addresser with 68,660 positions nationally.[77]

Plaintiff's counsel asked the vocational expert one question to confirm that he had considered only the factors and limitations

---

[73]   See 68-70.

[74]   Tr. 70.

[75]   Id.

[76]   The position of silver wrapper falls within the hotel and restaurant industry and entails wrapping individual place settings in napkins or inserting individual place settings in plastic bags and sealing with an electric sealer. See DOT, 318.687-018.

[77]   See Tr. 71.

presented in the ALJ's hypothetical scenarios.[78]   The attorney argued that Plaintiff's RFC should be below sedentary and that he should be found disabled pursuant to the Medical-Vocational Guidelines[79] ("Grid") prior to age 55 at sedentary and at age 55 at light or sedentary.[80]   The ALJ informed Plaintiff that the record established disability as of the change in age at his fifty-fifth birthday and that the ALJ would only be considering whether the evidence established disability prior to that date.[81]

### D.  <u>Commissioner's Decision</u>

On March 30, 2018, the ALJ issued a partially favorable decision.[82]   The ALJ found that Plaintiff had not engaged in substantial gainful activity since December 23, 2013, the alleged onset date.   The ALJ recognized the following impairments as severe: "degenerative disc disease of the cervical and lumbar spine; degenerative joint disease of the left shoulder; heel spurs; obesity; hearing loss; depression; anxiety; panic disorder; agoraphobia; and somatic symptom disorder."[83]   However, he found dyslipidemia and keratoconus to be nonsevere as no evidence

---

[78]     <u>See</u> Tr. 73-74.

[79]     <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[80]     <u>See</u> Tr. 74-75.

[81]     <u>See</u> Tr. 75-76.

[82]     <u>See</u> Tr. 16-18, 20-35.

[83]     Tr. 23 (emphasis omitted).

indicated that they would cause any work-related limitations.[84]  The ALJ cited the January 2018 treatment note stating that Plaintiff was "doing well and his vision was fine" and his "[v]isual acuity was 20/30 with correction on the right and 20/50 with correction on the left."[85]

At the next step, the ALJ found that Plaintiff did not meet the requirements of any impairment identified in the regulations as presumptively disabling[86] (the "Listings").  The ALJ found Plaintiff capable of a limited range of light work:

> [T]he claimant can lift and/or carry 20 pounds occasionally, 10 pounds frequently; can stand and/or walk 6 hours out of an 8 hour workday; can sit 6 hours out of an 8 hour workday; occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; no left[-]side overhead reaching and frequent left[-]side reaching in all other directions; must avoid concentrated exposure to noise; frequent left[-]side handling; can understand, carry out, and remember detailed, but not complex instructions, make decisions, attend and concentrate for 2 hours at a time, interact occasionally with the public, supervisors, and co-workers, and respond appropriately to occasional changes in routine work setting.[87]

The ALJ noted that Plaintiff's medical treatment was provided through the VA except Plaintiff's "outside treatment for pain

---

[84]     Id.

[85]     Id.

[86]     See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[87]     Tr. 25.

14

management and his non-severe vision problems."[88]   The ALJ acknowledged that Dr. Holmes listed "[k]ertoconus status post OS corneal transplant" in her report as one of Plaintiff's diagnoses.[89] The ALJ afforded Dr. Holmes' report on the consultative examination significant weight because, the ALJ explained, Dr. Holmes's opinions were consistent with her own findings, the SSA disability evaluation program, and the VA rating.[90]

Regarding the VA service-connected disability rating of seventy percent, the ALJ devoted a lengthy paragraph supporting his decision to give it little weight.[91]   The ALJ explained that "numerous differences" exist between the disability determination process of the VA and that of the SSA and described several of those differences.[92]

Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff had been unable to perform his past relevant work at any point since December 23, 2013.[93]   However, according to the ALJ, until Plaintiff qualified as an individual of advanced age, Plaintiff was able to perform the occupation of silver wrapper, which existed in significant numbers in the

---

[88]   Tr. 26.

[89]   Tr. 27.

[90]   See Tr. 32.

[91]   See id.

[92]   Id.

[93]   See Tr. 32-33.

15

national economy.[94]   The ALJ found that, after Plaintiff aged into the advanced category, he then met the requirements for a finding of disabled pursuant to the Grid.[95]   Therefore, the ALJ found that Plaintiff was not disabled from the alleged onset date of December 23, 2013, to the date on which his age category changed from an individual closely approaching advanced age to an individual of advanced age, but thereafter Plaintiff was disabled.[96]

On April 24, 2018, Plaintiff appealed the ALJ's decision.[97] On June 8, 2018, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[98]   After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.   <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002).

---

[94]     <u>See</u> Tr. 33–34.

[95]     <u>See</u> Tr. 34.

[96]     Tr. 21, 35.   The ALJ identified February 5, 2018, as the date Plaintiff changed categories.   The court notes that Plaintiff's fifty-fifth birthday was February 6, 2018.   <u>Compare</u> Tr. 33 <u>with</u> Tr. 201.

[97]     <u>See</u> Tr. 199, 315–16.

[98]     <u>See</u> Tr. 1–4.

## A.  __Legal Standard__

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  __Wren v. Sullivan__, 925 F.2d 123, 125 (5ᵗʰ Cir. 1991).  Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a); __see also Greenspan v. Shalala__, 38 F.3d 232, 236 (5ᵗʰ Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); __Jones v. Heckler__, 702 F.2d 616, 620 (5ᵗʰ Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial
> gainful activity, will not be found to be disabled no
> matter what the medical findings are; (2) a claimant will
> not be found to be disabled unless he has a "severe
> impairment;" (3) a claimant whose impairment meets or is
> equivalent to [a Listing] will be considered disabled
> without the need to consider vocational factors; (4) a
> claimant who is capable of performing work that he has
> done in the past must be found "not disabled;" and (5) if
> the claimant is unable to perform his previous work as a
> result of his impairment, then factors such as his age,
> education, past work experience, and [RFC] must be

considered to determine whether he can do other work. Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

**B.  Substantial Evidence**

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Biestek v. Berryhill, ____ U.S. ____, 139 S. Ct. 1148, 1154 (2019)(internal quotations marks omitted).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  Id.  It only requires "more than a mere scintilla."  Id.

The Commissioner has the responsibility of deciding any conflict in the evidence.  Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  See Salmond v. Berryhill, 892 F.3d 812, 819 (5th Cir. 2018).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the

Commissioner's judgment.  <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits prior to Plaintiff's fifty-fifth birthday. Plaintiff asserts that the ALJ's decision contains the following two errors: (1) the ALJ failed to accord great weight to the VA's disability rating; and (2) the hypothetical individual the ALJ presented to the vocational expert did not include all of Plaintiff's limitations.  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

### A.  <u>Weight Given VA Disability Rating</u>

The VA and the SSA are governmental agencies that separately administer programs to provide disability benefits.  <u>Compare</u> 38 C.F.R. §§ 4.1-4.31 (explaining the VA's procedures for rating disabilities), <u>with</u> 20 C.F.R. §§ 404.1501-404.1599 (explaining the SSA's procedures for determining disability).  The programs employ different criteria in analyzing disability.  <u>See</u> <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2001).

Although a disability determination by another governmental agency is not binding on the SSA, such a determination "is evidence that is entitled to a certain amount of weight and must be

considered by the ALJ." Id.; see also 20 C.F.R. § 404.1504 (discussing disability determinations by other organizations and governmental agencies). An ALJ may discount a VA rating if valid reasons are cited. See Chambliss, 269 F.3d at 522 ("ALJs need not give 'great weight' to a VA disability determination if they adequately explain the valid reasons for not doing so.").

"An ALJ's disagreement with the VA's finding of disability is not reversible error if the record reflects consideration of that finding." Allison v. Berryhill, No. 1:16-CV-0170-BL, 2018 WL 1274853, at *6 (N.D. Tex. Feb. 16, 2018)(unpublished)(quoting Duke v. Colvin, No. 5:16-CV-151-DAE, 2016 WL 6651394, at *5 (W.D. Tex. Nov. 10, 2016)(unpublished)). However, reversible error is found when the "ALJ fails to consider the disability rating and explain [his] reasons for discounting it." Id. (quoting Rasco v. Berryhill, No. 4:17-CV-946, 2018 WL 587948, at *4 (S.D. Tex. Jan. 5, 2018)(unpublished)).

Plaintiff argues that the ALJ did not give sufficient weight to the VA rating, stating that the "rote recitation regarding differences between the [SSA's] process and the [VA's] process is woefully insufficient."[99] The court disagrees.

The ALJ clearly considered the VA rating because he mentioned it and explained the differences between the VA and SSA disability programs. The ALJ explained that he decided to afford it only

---

[99]     Doc. 12, Pl.'s Mot. for Summ. J. p. 15.

little weight because of those differences and that he found Dr. Holmes' opinions, which the ALJ afforded great weight, to be consistent with the VA rating of seventy percent. Although the ALJ did not address how those differences specifically applied to Plaintiff's disability determinations, he did not err in failing to do so. The ALJ needed only to provide valid reasons for discounting the VA rating. His articulation of the differences between the two disability programs was sufficient to satisfy the legal requirements.

Plaintiff quotes at length <u>Williams v. Berryhill</u>, Civil Action No. H-17-1061, 2018 WL 3750520, at **14-15 (S.D. Tex. 2018)(unpublished), as stating the "ALJ['s] duty to properly evaluate VA findings[.]"[100] The quoted portion of <u>Williams</u> did address the legal requirements for consideration of VA disability ratings. However, the case is distinguishable from the one presently before this court. There, the ALJ mentioned Plaintiff's VA rating once but did not offer any reasons for discounting the weight assigned. The court found that it could not assume the ALJ considered the VA disability determination in light of the ALJ's failure to explain why it was not given great weight, and, therefore, the court found reversible error. That is not the case here. As discussed above, the ALJ explained valid reasons for giving the VA disability determination little weight.

---

[100]   <u>Id.</u> p. 11.

Furthermore, the ALJ was not required, as Plaintiff argues, to discuss and evaluate the VA's findings.[101]  Plaintiff cites no legal support for this argument.  As mentioned above, the legal authority sets the bar much lower, requiring only that the ALJ consider the VA rating and explain the reasons for discounting it.[102]

The ALJ did not err in the consideration of the VA disability rating.

## B.  Hypothetical Individual Presented to Vocational Expert

At step five of the disability analysis, an ALJ considers whether the claimant is able to make an adjustment to other work. See 20 C.F.R. § 404.1520(g).  An individual will be determined disabled if his impairments are so severe that he can perform neither his previous work nor "engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, . . . whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).

Severity is determined by whether the impairment or

---

[101]     Defendant also points out that Plaintiff provided only letters regarding the VA award and benefits, not the underlying medical determinations.

[102]     Defendant notes that, effective March 27, 2017, the regulations have been revised to clarify that the SSA adjudicators need not provide analysis about disability decisions of other governmental agencies or nongovernmental entities. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5,844-01 (Jan. 18, 2017), 2017 WL 168819.  Be that as it may, the ALJ did provide analysis here as to the weight given the VA rating and was under no obligation to do more.

combination of impairments significantly limits the claimant's physical or mental ability to perform basic work activities; an impairment or combination of impairments is not severe when evidence establishes only a slight abnormality that would only have a minimal effect on the claimant's ability to work. See SSR 96-3p, 1996 WL 374181, at *2; SSR 85-28, 1985 WL 56856, at *3.

> A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms)[] and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities.

SSR 96-3p, 1996 WL 374181, at *2.

Vocational experts are valuable resources because they are "familiar with the specific requirements of a particular occupation, including working conditions and attributes and skills needed." Carey v. Apfel, 230 F.3d 131, 145 (5th Cir. 2000)(quoting Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986)); see also Dominguez-Herrera v. Astrue, 334 F. App'x 651, 654 (5th Cir. 2009)(unpublished)(quoting Vaughan v. Shalala, 58 F.3d 129, 132 (5th Cir. 1995)). Although the SSA relies primarily on the DOT for "information about the requirements of work in the national economy," the SSA turns to vocational experts and vocational specialists "to resolve complex vocational issues." SSR 00-4p, 2000 WL 1898704, at *2.

The ALJ is required to ask a vocational expert if his

testimony about the requirements of a job conflicts with information in the DOT and, if it does, to obtain a reasonable explanation for the conflict before relying on the vocational expert's testimony instead of the DOT information. See SSR 00-4p, 2000 WL 1898704, at **2, 4. Absent an unresolved conflict, the ALJ may rely on the vocational expert's testimony as substantial evidence of an individual's ability to perform certain jobs as long as the ALJ posed a hypothetical question that incorporated all of the impairments that the ALJ recognized as supported by the record and the claimant was given an opportunity to correct errors or omissions in the hypothetical question. See SSR 00-4p, 2000 WL 1898704, at *4; Wise v. Barnhart, 101 F. App'x 950, 951 (5th Cir. 2004)(unpublished)(citing Bowling, 36 F.3d at 436). "[I]f the [ALJ's] hypothetical [question] omits a recognized limitation and the claimant or his representative is afforded the opportunity to correct deficiencies in the [ALJ's] question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the [ALJ]'s findings and disabilities recognized but omitted from the question), there is no reversible error." Wise, 101 F. App'x at 951 (internal quotation marks omitted)(quoting Bowling, 35 F.3d 436).

Plaintiff contends that the "ALJ failed to factor in all of [Plaintiff's] limitations[,]" and, "had the ALJ considered them

24

all, a different answer from the [v]ocational [e]xpert would have resulted[.]"[103]  The court disagrees.

Despite the noticeable breadth of Plaintiff's argument, "severely impaired vision" is the only additional limitation Plaintiff asserts should have been included in the hypothetical question.[104]  As presented in Plaintiff's motion, this argument encompasses three sub-arguments: (1) that the ALJ should have found Plaintiff's impaired vision to be a severe impairment; (2) that the vocational expert's opinion of whether Plaintiff could perform the job of silver wrapper would have been affected by the inclusion of a vision limitation; and (3) that the determination that full time positions for silver wrappers "existed in vocationally significant numbers in the Corpus Christi area" where Plaintiff lived "strains credulity."[105]

Beginning with the severity challenge, the court notes the ALJ explained that the record was devoid of evidence suggesting any work-related limitations attributable to Plaintiff's eye condition. The ALJ cited only to the most recent eye treatment note, which stated that Plaintiff reported that his vision was fine and recorded Plaintiff's visual acuity as 20/50 on the left and 20/30 on the right.  Although that evidence did not provide a

---

[103]    Doc. 12, Pl.'s Mot. for Summ. J. p. 16.

[104]    Id.

[105]    Doc. 12, Pl.'s Mot. for Summ. J. p. 16.

longitudinal account of Plaintiff's eye condition, it arguably provided more than a mere scintilla of evidence in support of a finding of non-severity.

The record, however, contained more evidence that Plaintiff's eye impairment was not severe. Although the treatment notes reflect that testing routinely placed Plaintiff's distance vision below normal, they also reflect that his vision did not significantly limit his ability to perform basic work activities. He reported to providers only that, at various times, he was limited in his ability to drive at night and needed to wear prescription sunglasses to drive during the day. Despite reporting to the SSA in July 2016 that he could no longer drive at night, Plaintiff contemporaneously reported no such limitation at eye appointments.[106]  In fact, earlier reports in September 2015 and January 2016 were that his night vision was improving.[107] Nevertheless, to the degree that driving could be considered a work activity, Plaintiff's vision imposed no more than a minimal effect on his ability to perform that activity.  In this case, of course, driving was not a required activity for the other work cited by the ALJ.

Plaintiff argues that "[t]he employee must be able to identify

---

[106]   See Tr. 568.

[107]   See Tr. 554, 559.

26

soap stains and tarnished areas on the silverware[.]"[108]   This abstract statement does not comport with the evidence of Plaintiff's abilities.   Amid other evidence, Plaintiff shopped online and watched television regularly.   Additionally, the treatment records indicate that Plaintiff never complained at eye appointments of an inability to perform tasks requiring close-up vision.   More salient for purposes of substantial evidence are the consistent opinions of the SSA medical consultants and Dr. Holmes that Plaintiff's eye condition was not severe and imposed no visual limitations whatsoever.   The record as a whole provides substantial evidence that the degree of interference with Plaintiff's activities of daily living was, at most, minimal.

Because the court finds that the medical evidence supports the ALJ's determination that Plaintiff's eye condition was not severe, the court also finds the ALJ's omission of a limitation in the hypothetical RFC posed to the vocational expert was not an error. Therefore, the vocational expert's opinion as to whether the availability of jobs for the occupation of silver wrapper would be affected by the inclusion of a visual limitation is not relevant.[109]

Turning to Plaintiff's third sub-argument, the court refers Plaintiff to the SSA text itself, which clearly states that

---

[108]    Id. pp. 16-17.

[109]    The court also notes that Plaintiff's attorney, despite the opportunity, did not seek additional information as to how Plaintiff's eye condition would have affected the vocational expert's calculation of the number of available jobs for the hypothetical individual.

availability in the immediate area in which a claimant lives is a non-factor in determining whether the individual is capable of performing other work.  See 42 U.S.C. § 423(d)(2)(A).  Rather, the question is whether the national economy offers any type of other work that the individual can perform.

The ALJ did precisely what the law requires.  He presented a hypothetical question to the vocational expert that included all of the limitations the ALJ acknowledged as supported by the record. Based on that hypothetical individual and a review of the medical record and hearing testimony, the vocational expert offered two examples of jobs that Plaintiff could perform.  The vocational expert's testimony is substantial evidence supporting the ALJ's decision.

The ALJ did not err in relying on the vocational expert's testimony.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual

findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 26th day of November, 2019.

Nancy K. Johnson
United States Magistrate Judge